George P. BAKER et al., Trustees of the Property of Penn Central Transportation Company, Plaintiffs,

v.

NATIONAL CITY BANK OF CLEVELAND, Defendant.

Civ. A. No. C 73-214.

United States District Court,
N. D. Ohio, E. D.
June 12, 1974.

Thomas R. Skulina, Cleveland, Ohio, Marvin Comisky, Goncer M. Krestal, Philadelphia, Pa., for plaintiffs.

Frank C. Heath, John L. Strauch, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiffs George P. Baker, Richard C. Bond and Jervis Langdon, Jr., are trustees of the property of the Penn Central Transportation Company (Penn Central), the debtor in proceedings No. 70–347 in the United States District Court for the Eastern District of Pennsylvania (Reorganization Court). Penn Central is presently undergoing reorganization pursuant to the authority of section 77 of the Bankruptcy Act, 11 U.S.C. § 205. Defendant National City Bank of Cleveland (NCB) is a duly organized national bank existing under the laws of the United States of America with its principal office in Cleveland, Ohio.

Plaintiffs have instituted this action under section 23 of the Bankruptcy Act, 11 U.S.C. § 46, to recover Penn Central property that plaintiffs allege is held by NCB as an adverse claimant. The property that is the subject of this action is Penn Central's checking account No. 203–877–4 at NCB, in the amount of $927,333.30 (hereafter $927,000). By its answer NCB claims that on Saturday, June 20, 1970, it set off this entire deposit against Penn Central's unpaid loan indebtedness of $3,000,000. As will later be developed defendant relies on a declaration of set-off embodied, it contends, in an exchange of telephone calls on Saturday afternoon, June 20, 1970, between NCB's chairman of the board and chief legal officer, and the chief legal officer and manager of the checking accounts department in which Penn Central's checking account was maintained.

Penn Central sent a letter agreement to NCB on March 3, 1970, confirming the terms of a new arrangement whereby NCB would become a "so-called 'swingline' bank in the amount of $3,000,000 . . . in lieu of [NCB's] standby credit." On March 11, 1970, NCB accepted through its vice president, John Hildt, the terms of the agreement which stated that "borrowing shall be repaid by [Penn Central] upon [NCB's] demand." On April 28, 1970, Penn Central borrowed the full $3,000,000 pursuant to the terms of the March 3, 1970 letter agreement. Remaining unpaid on June 20, 1970, the $3,000,000 loan was then due as a demand obligation at the time NCB claims it effected a set-off.[1]

On Sunday, June 21, 1970, at 5:40 p. m., United States District Judge William C. Kraft for the Eastern District of Pennsylvania, determined that Penn Central's petition for reorganization was filed in good faith and he approved the petition as properly filed under section 77 of the Bankruptcy Act. Thereupon Judge Kraft entered an order that stated in paragraph 10:

> All persons, firms and corporations, . . . holding for the account of the Debtor deposit balances or credits be . . . *restrained and enjoined from . . . off-setting the same, or any thereof, against any obligation of the Debtor,* until further order of this Court. In the Matter of Penn Central Transportation Co., Debtor, No. 70–347 (E.D.Pa., June 21, 1970). [Emphasis added.]

Plaintiffs request that this court issue an order declaring invalid the claimed

---

1. The trustees sought to amend their complaint to reflect that the parties had later agreed to a time note. The court denied the trustees leave to amend, since the factual record did not reflect the existence of a time note.

set-off of the Penn Central checking deposit balances. It requests that this court order NCB to restore to the Penn Central checking account, as property of the plaintiff trustees,

> all deposit balances of Penn Central with defendant as the same existed prior to defendant's attempted set off, with interest from June 21, 1970 to the date of restoration, and to honor plaintiffs' withdrawals therefrom.

Succeeding Judge Kraft as the Reorganization Court, Judge John P. Fullam conducted summary proceedings with respect to nine banks (of the remaining 142 banks with then existing Penn Central accounts no set-off was claimed) that purported to set off the debtor's bank deposits against loans due those banks. In the decision reported as Penn Central Transportation Co. v. National City Bank of Cleveland, Ohio, 315 F. Supp. 1281 (E.D.Pa.1970), aff'd 453 F. 2d 520 (3 Cir.), cert. denied 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972), Judge Fullam ordered eight banks and the ninth, NCB (but only to the extent of $22,666.30, a Penn Central deposit which the bank received and set off on June 22, 1970), to restore to the debtor's account all balances as they existed on June 21, 1970. However, with respect to NCB's alleged set-off of $927,000 of June 20, 1970, the court stated:

> It is apparent that no violation of the Order is properly chargeable; moreover, the existence of a substantial adverse claim renders inappropriate for summary disposition the question of the validity of that setoff. 315 F. Supp. at 1285.

■ At the trial held by this court no oral testimony was offered. By agreement the record comprises NCB documents, other documents, and deposition testimony of NCB's officers and employees. The evidence essentially is not in dispute, though the parties draw different inferences from the evidence.

The controlling issue presented for decision is whether NCB effected a valid set-off on Saturday afternoon, June 20, 1970.[2] Under uniformly accepted law this claim of set-off is a defense which NCB must prove. 20 Am.Jur.2d § 152 at 360–61 (1967).

### I.

The parties at the oral argument took opposing positions as to what law this court should apply in considering NCB's defense of set-off. The plaintiff trustees insist that federal law is controlling, although no federal common law of set-off has been cited. Defendant NCB insists that state law controls and cites set-off statutes of Ohio and Pennsylvania and court decisions of both states that apply these statutes.

Both parties refer the court to Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 174 F.2d 783 (3 Cir. 1949), a decision affirming a reorganization court's refusal to honor a bank's set-off of a debtor's checking account against a demand note indebtedness. Speaking for the Court of Appeals, Judge Goodrich thus discussed the broad issue of what law to apply:

> We are, . . . dealing with federal law in all matters concerning the conduct of reorganization proceedings, although, of course, a reorganization court, like a bankruptcy court, takes the property situation as it finds it, and property rights will have been determined by state law prior to bankruptcy or reorganization proceedings. Id. 174 F.2d at 785 [Footnotes omitted.] See also In Re Universal Medical Services, Inc., 460 F.2d 524, 526 (3 Cir. 1972).

Susquehanna involved

> a contest between the trustees in reorganization for the Susquehanna Chemical Corporation and the bank with which the corporation had, on July 30, 1948, checking accounts. The debtor

---

2. Hereafter dates will be discussed without reference to the year unless the year is other than 1970.

owed the bank an amount greater than its checking accounts upon a demand note containing the usual Pennsylvania confession of judgment clause. *Id.* 174 F.2d at 784.

The reorganization petition was filed and the trustees were appointed on July 30, 1948.

> The bank thereafter refused to honor checks drawn on the checking accounts of the debtor corporation and claimed that under Pennsylvania law it was entitled to apply these accounts to the payment of its own debt. *Id.* 174 F. 2d at 785.

The trustees sued the bank in the reorganization court for "a judgment that the bank be directed to pay the amount of the deposits to the trustees." Upon the district court rendering judgment against the bank, the bank appealed.

The Court of Appeals was faced with the argument of the appellant bank that under the Pennsylvania Defalcation Act [3] "a bank depositor who owes his bank money has only a claim against the bank for the difference between his 'deposit' and the bank's claim against him." Pursuing this point the Court stated:

> The customer's lack of claim against the bank is conditioned by the circumstance that 'the right of defalcation is claimed.' But when one talks about claiming such a right, we get the equivalent of set-off or counter-claim called by another name. And then we get to the place of considering set-off, counter-claim, etc. and we are, as already indicated, away from the state law and governed by the federal law upon the subject. We pass, then, from the consideration of state statute to federal statute upon the subject-matter involved. *Id.* 174 F.2d at 786. [Footnote omitted.]

Thereafter the Court of Appeals recognized that Lowden v. Northwestern National Bank, 298 U.S. 160, 56 S.Ct. 696,

80 L.Ed. 1114 (1936) and other cited authorities "show beyond doubt that the reorganization court is not bound to apply, willy-nilly, the set-off rule of Section 68 of the Bankruptcy Act."

*Susquehanna's* affirmance of the District Court's denial of the bank's right to set off a debtor's checking account against the debtor's demand note indebtedness is helpful but not dispositive of the issues facing this court. Factually *Susquehanna* differs from the instant case since in *Susquehanna* the bank's attempted set-off occurred after the reorganization petition was filed. Further, the District Court in *Susquehanna* sat as a reorganization court under Chapter XI of the Bankruptcy Act with jurisdiction to conduct a summary proceeding.

The instant action is a plenary proceeding with the district court's jurisdiction derived from section 23 of the Bankruptcy Act, 11 U.S.C. § 46. Under section 23a this court's jurisdiction is expressly "distinguished from proceedings under this title" [Title 11, The Bankruptcy Act]. In the present controversy "between . . . trustees as such and adverse claimants, concerning the property acquired or claimed by the . . . trustees" the jurisdiction of this district court must be exercised

> in the same manner and to the same extent as though such proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants. Bankruptcy Act § 23, 11 U.S.C. § 46a.

This language indicates a congressional intent to make a plenary action under section 23 subject at least in part to state law. Indeed, section 23b contemplates that plenary suits brought by a trustee under section 23a ordinarily would be brought in state court or under the diversity jurisdiction of a United States district court. *See generally,* Whitman v. Chicago & N. W. Ry., 70 F.

---

3. The Pennsylvania statute is set forth in *Susquehanna, supra,* 174 F.2d n. 4 at 786. The Pennsylvania statute is similar in purpose and result to Ohio Rev.Code § 2309.19 set forth *infra* at 11.

**1142**

Supp. 9 (D.Minn.1947). Section 23b provides:

> Suits by the . . . trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under the Act had not been instituted, unless by consent of the defendant.

Wymard v. McCloskey & Co., 342 F.2d 495, 498 (3 Cir. 1965), construing the consent provision, holds:

> Viewing this as a limitation of grace upon the normal reach of federal jurisdiction, the courts have consistently held that a defendant's consent to be sued where the debtor could not have sued him need not be express. Rather, submission by the defendant to the jurisdiction of the court without asserting any objection predicated upon section 23, sub. b is deemed a sufficient consent within the meaning of that section. Gins v. Mauser Plumbing Supply Co., 2d Cir. 1945, 148 F.2d 974 (filing answer); Detroit Trust Co. v. Pontiac Savings Bank, 6th Cir. 1912, 196 F. 29, aff'd 237 U.S. 186, 35 S.Ct. 509, 59 L.Ed. 907 (filing answer); McEldowney v. Card, C.C.E.D. Tenn.1911, 193 F. 475 (answer, setoff and trial).

▮ Plaintiff trustees have brought this action under section 23, but have not predicated this court's jurisdiction on diversity of citizenship between the parties, although complete diversity of citizenship between the parties exists. Since defendant NCB admits the content of paragraph 3 of the complaint and does not challenge this court's jurisdiction, defendant's consent to have this court hear and determine this controversy is plainly implied. In hearing this matter under section 23 this court will do so "in the same manner and to the same extent as though such proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants." Thus, the court will look to state law to determine property rights and will consider perti-

nent state set-off law. Yet at the same time this court will not sanction a violation of the injunctive order of Judge Kraft of June 21, 1970, issued under the bankruptcy laws of the United States applicable to railroad reorganizations.

▮ The court must next ascertain which state law applies. The letter agreement of March 3, 1970, was finally accepted and executed by NCB in Cleveland, Ohio. The $3,000,000 loan proceeds advanced by NCB to Penn Central on April 28, 1970, were deposited in Penn Central's checking account at NCB in Cleveland and NCB paid all checks on this fund in Cleveland except for a $635,000 check that was dishonored on June 16, in Cleveland. Further, the monies sought by the trustees are in Cleveland and all the telephone conversations and verbal acts of NCB's officers and employees on which defendant NCB relies to effect a set-off occurred in the Cleveland, Ohio area. With all the operative facts clustering in Ohio, out of which arises the plaintiffs' right of action to compel restoration of the debtor's checking account and NCB's claimed set-off of the checking account balance of $927,000, it is determined that Ohio law should govern and control property rights and the concomitant set-off issues in this case.

## II.

▮ A part of the law merchant and established in commercial transactions is the right of set-off that permits a bank to apply the debtor's deposits on his debts to the bank as they become due. A leading Ohio case on the right of set-off, Bank of Marysville v. Windisch-Muhlhauser Brewing Co., 50 Ohio St. 151, 157, 33 N.E. 1054, 1055 (1893), has thus described the relationship of the bank to its depositor:

> Unless there is some agreement to the contrary, deposits received by the bank become its property. . . . [The bank] is accountable as a debtor, and the relation between it and the general depositor is essentially that of

debtor and creditor. In legal effect the deposit is a loan to the bank.

Commenting upon the right of set-off itself the court stated:

> [A] bank has a general lien on all the funds of a depositor in its possession for any balance due on general account, or other indebtedness contracted in the course of their dealings, and may appropriate the funds to the payment of such indebtedness. . . . Though this right is called a "lien," strictly it is not, when applied to a general deposit . . . . Properly speaking, the right, in such case, is that of set-off, arising from the existence of mutual demands. *Id.* 50 Ohio St. at 158–159, 33 N.E. at 1055. *See also* 5A Michie on Banks and Banking §§ 114–124 at 300–342 (1973).

In addition to examining the Ohio Supreme Court's opinion in *Bank of Marysville, supra* the court has examined the Supreme Court's case file. The case was decided in the trial court on plaintiff Brewing Company's demurrer to the bank's answer. Any facts in the case, therefore, must be found in the bank's answer, which must have been taken as true by the trial court, or in any admissions of the Brewing Company in its amended petition.

George Schlegel, a Bank of Marysville depositor, as of October 16, 1888, had a general "deposit account" at the bank which was $378.41 and was indebted to the bank in the sum of $1,050 on an overdue promissory note. On October 16, 1888 Schlegel gave to the plaintiff Brewing Company his check in the sum of $368.20 drawn upon the Marysville bank. The bank's answer states

> [t]hat on said 17th day of October, 1888, and before the defendant had any knowledge of the existence of said check, and before its presentation for payment, gave said Schlegel credit upon said indebtedness in said sum of $378.41.

The bank's answer fully justifies the conclusion, which this court now makes, that when two days before the Brewing Company presented Schlegel's endorsed check for payment the bank "gave said Schlegel credit upon said indebtedness in said sum of $378.41," the bank did so by bookkeeping entries.[4] On October 19, 1888, when the brewery presented Schlegel's duly endorsed check for payment, the bank refused payment on said check.

The Court, relying upon Revised Statutes § 5077, concluded that the bank's set-off was effective and reversed the lower court. Section 5077 states,

> When cross demands have existed between persons, under such circumstances that if one had brought an action against the other a counterclaim or set-off could have been set up, neither can be deprived of the benefit thereof by assignment by the other, . . . but the two demands must be deemed compensated, so far as they equal each other.

The Court said

> it is clear the right of set-off was not defeated or impaired by the check, even if it be treated as an assignment. The statute plainly protects the right of set-off, when it existed between the

---

4. NCB suggests that bookkeeping entries were not made prior to the presentment of the check. Supporting this contention, NCB relies upon language in the Ohio Supreme Court's opinion which states, "the petition avers that when the plaintiff presented the check for payment the drawer had sufficient funds in the bank for its payment . . . .." *Id.* 50 Ohio St. at 159, 33 N.E. at 1055. The plaintiff brewing company, however, demurred to the bank's answer, and the factual statements in the brewing company's petition were not binding on the bank. Further, the Court does not find that language inconsistent with its conclusion that bookkeeping entries had already been made. In its amended petition the brewing company averred that "on the said 16th day of October . . . until after the 19th day of October . . . the [bank] had and held of the money so deposited with it by . . . Schlegel [$368.20] and has ever since retained the same." The brewing company, denying the set-off, is contending that the bank had sufficient funds in the account to honor Schlegel's check.

parties, notwithstanding the assignment by either of his demand. *Id.* 50 Ohio St. at 158, 33 N.E. at 1055.

Concluding this line of analysis the Court states:

> By force of the statute the indebtedness of the bank to Schlegel was paid by a corresponding amount of the indebtedness of Schlegel to the bank; and crediting Schlegel's note with the amount due on his deposit account, as was done by the bank, was but giving effect to the provisions of the statute. *Id.* 50 Ohio St. at 158, 33 N.E. at 1055.

Thus it is evident that if Schlegel's writing of the check on October 16 were an assignment, then by operation of law section 5077 would preserve the bank's right of set-off. However, even if not considered an assignment a debtor-creditor relationship existed between Schlegel and the bank, and the bank's application of Schlegel's deposit account against his overdue indebtedness on the promissory note was merely an action that put into effect the statutory provisions. Thus if the writing of the check did not invoke the statute by force of law the actions of the bank in crediting Schlegel's account by book entries were sufficient alone to effect a non-judicial set-off.

■ Recodified twice since it was Revised Statute § 5077, the Ohio law is now Ohio Revised Code § 2309.19. It reads:

> When cross demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, neither can be deprived of the benefit thereof by assignment by the other, or by his death. The two demands must be deemed compensated so far as they equal each other.

Ohio courts have continued to construe this section in a fashion similar to the *Bank of Marysville* court. Thus, where there is mutual indebtedness between a bank and a depositor, a garnishment action or other assignment of the deposi-

tor's funds, by virtue of the foregoing statute, does not deprive the bank of its right to set off the mutual obligations of the bank and depositor. *See* Cleveland Trust Co. v. Crothers, 15 Ohio L. Abs. 445 (8 Dist.Ct.App.1933); Marrison v. Hogue, 57 Ohio L.Abs. 571, 95 N. E.2d 15 (Munic.Ct.1950).

■ The statutory language "[cross] demands must be deemed compensated so far as they equal each other" is not self-executing. Were a contrary statutory construction adopted a bank depositor who is also indebted to a bank upon a demand loan would never in fact have a bank account since all deposited funds would be automatically set off against the depositor's loan account. How a bank may exercise its right of set-off under such circumstances is of course the issue here to be determined. Nevertheless, it is evident from the statements of NCB's counsel and from NCB records which evidence both a loan account and a checking account from which withdrawals and deposits were made by Penn Central, that NCB did not treat or regard the Penn Central checking account as automatically set off even though mutual obligations existed.

Next it is necessary to reconcile the reach of Ohio Revised Code § 2309.19 with Judge Kraft's Order of June 21, that enjoined all corporations from effecting off-sets. Judge Kraft's order prevented NCB from thereafter exercising set-off. The authority of the reorganization court to enjoin set-offs during the pendency of reorganization proceedings was upheld by the Third Circuit Court of Appeals in *Penn Central* as it had done earlier in *Susquehanna, supra.* In part it ruled:

> The reorganization court has merely denied [the bank's] resort to [set-off] during reorganization. Its decision was grounded upon equitable considerations inherent in the administration of the statutory scheme of railroad reorganization. Indeed, the district court found that the continuation of the operation of the railroad, the basic

purpose of reorganization, would have been frustrated if the 142 banks in which it maintained accounts aggregating millions of dollars were permitted to set-off these balances. . . . In Re Penn Central Transportation Co., 453 F.2d 520, at 523 (3 Cir.), cert. denied 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972).

Therefore, because of the injunction against off-sets issued by Judge Kraft, if the bank did not effect a set-off in advance of 5:40 p. m. on June 21, 1970, it was enjoined from setting off Penn Central's deposits thereafter.

█ This court ruled at trial that it is without power to rescind NCB's set-off, should it be determined that prior to Judge Kraft's Order of June 21, NCB had already effectively set off the Penn Central checking account on Saturday, June 20. Contrariwise, it is determined that despite this court's duty to apply Ohio Revised Code § 2309.19 in this plenary proceeding, the set-off statute cannot operate to supersede Judge Kraft's reorganization court injunction against bank set-offs. Thus, Ohio Revised Code § 2309.19 cannot operate to render any bank set-off occurring on Monday, June 22, effective so as to antedate Judge Kraft's injunction order of June 21.

### III.

### A.

In its amended answer defendant NCB contends

that at approximately 5:10 p. m. on June 20, 1970, John S. Fangboner, Chairman of the Board and Chief Executive Officer of the defendant, in a telephone call to Theodore W. Jones, Vice President and General Counsel of defendant, informed Jones that Fangboner had been advised that the United States government had refused to act as guarantor of a proposed two hundred million dollar ($200,000,000) loan to the Penn Central Transportation Company, that Fangboner then declared a set-off of the entire deposit

balance in Penn Central's account with defendant . . . .

Reiterating the affirmative defense stated in defendant's answer its counsel at oral hearing said, in part:

. . . but we think pretty clearly that our evidence does show a declaration of intent to elect the set-off by the chief executive officer of the bank, by the man who was designated by him to supervise the Penn Central account.

In opposition plaintiff insists:

The telephone conversation between Mr. Fangboner and Mr. Jones at 5:10 p. m., Saturday, June 20, 1970, was insufficient to effect a set-off against Penn Central's deposit account with NCB as of that time, in the absence of notice thereof to Penn Central and the posting of entries in NCB's records reflecting and evidencing the set-off.

NCB's set-off against Penn Central's deposit account was not effected until correctly entered on the NCB's official business records and notice thereof was given to Penn Central in conformity with NCB's procedures.

The record discloses that in late May, 1970 Fangboner had learned that approximately $100,000,000 in Penn Central commercial paper was falling due in early June. He further heard that a proposed $100,000,000 Penn Central debenture issue had been given a reduced rating.

Early in June, 1970 Penn Central was seeking a $200,000,000 V-loan from a group of commercial banks to be guaranteed by the Department of Defense under the Defense Production Act, 50 App.U.S.C. § 2091 et seq. and Federal Reserve Board Regulation V, 32A C.F.R. § 239. The First National City Bank of New York was acting as Penn Central's agent in these V-loan negotiations.

Because of his concern over the financial stability of Penn Central, Fangboner on June 8, asked Jones, the general counsel at NCB, to become "the control

point" and "to get into the middle as to contacts with Penn Central."

Undoubtedly pursuant to Fangboner's assignment of responsibility Jones took a series of actions on June 12 (Friday), June 15 (Monday), and June 16 (Tuesday) that related to the Penn Central accounts. Among other things, on June 12 and June 15 Jones issued memoranda to Matthew R. Gundic, manager of the checking accounts department, that first ordered set-off and then rescinded set-off of the checking account. On June 16 Jones ordered set-off; appropriate bookkeeping entries were made, and Penn Central was notified of the set-off and that National City Bank would not honor a $635,000 Penn Central check, not yet presented to the bank.

On June 17 Fangboner was requested by First National City Bank of New York to reverse the June 16 set-off on the grounds that the set-off was having a harmful effect on the V-loan negotiations. Thereupon, Fangboner ordered reversal of the June 16 set-off. Also on the same day Jones signed a letter of intent, drafted by the First National City Bank of New York "as agent" for Penn Central, and dated June 10, wherein NCB indicated its intention not to call a default on the $3,000,000 loan for a period of 15 days, in order to allow completion of the V-loan negotiations.

In the evening of June 19, Newton Cutler, a vice president of First National City Bank of New York, notified Fangboner that Penn Central's V-loan application had been refused. Cutler stated during this conversation that "the guaranteed loan is dead, it cannot be consummated, and you are on your own."

On Saturday morning, June 20 Fangboner spoke with Jones at his home to ensure his availability later in the day and spoke to Claude M. Blair, NCB's president and chief administrative officer, to relate the failure of the V-loan negotiations and to inform Blair of his plan to set off. Later that day Fangboner spoke to the retired NCB board chairman and other NCB directors at a local golf club. At 5:10 p. m. on June 20, Fangboner called Jones and told him, "We are going to set off immediately," and "to make the set-off effective as of now." Jones called Gundic and informed him

> that Mr. Fangboner had set off the Penn Central deposit against the loan balance, and told him that we should put through entries evidencing that set-off just as quickly as possible.

Mr. Gundic indicated that it would be impossible to put through entries at that time . . . .. But that entries would be put through Monday, June 22 showing that the set-off had in fact been effected on Saturday afternoon, June 20th.

Gundic related the following conversation with Jones:

A He [Jones] advised me that Mr. Fangboner had declared we were going to set off on the Penn Central account as of that particular date— which I remember, because it was a Saturday . . . .

\* \* \* \* \* \*

A Yes. I have worked at the bank for about 17 years and hadn't received a call like that on Saturday.

\* \* \* \* \* \*

Q Did you do anything on Saturday?

A No. We discussed the case or the declaration of the set-off that he advised me of . . . ..

\* \* \* \* \* \*

Q Did you do anything on Sunday, relative to this matter?

A No, I did not.

Jones then called Fangboner and told him that he "had contacted Gundic and that the set-off was in effect." No entries were made to Penn Central's deposit or loan accounts or was any other NCB record made on June 20 or June 21 to evidence a set-off. As already mentioned the petition for reorganization was filed and Judge Kraft's order was issued on Sunday, June 21, 1970.

## B.

In their brief counsel for the defendant NCB urges

> Because the law of set-off deems reciprocal matured debts to be mutually compensated by operation of law, all that is required to effect a valid set-off is some assertion or declaration of the right, and the recording of bookkeeping entries on the date the set-off is declared is not a prerequisite to a valid set-off as of the date of declaration.

In support of this position defendant relies primarily on several Ohio and Pennsylvania cases.

*Cleveland Trust Co. v. Crothers, supra* considered

> whether or not the Bank had a right to set-off and apply [that] deposit of Mrs. Stevens on her past due debt secured by a mortgage after service of an order in aid.

Speaking for the Ohio Court of Appeals Judge Lieghley held:

> Sec. 11321 GC [now Ohio Rev.Code § 2309.19] unequivocally gives the right of set-off to parties with present-due cross-demands. . . .
>
> Whether by check or otherwise, the depositor or the Bank cannot by act or conduct defeat the rights conferred to both or either by § 11321 GC. . . .
>
> Finally, it is our opinion that the right of set-off where cross demands exist is given by statute in any case in which suit is brought by the one party in which suit the other party may legally counter-claim. The Bank has the right of set-off at all times up to the amount of the indebtedness past due, indebtedness of the depositor to the bank or vice versa. *Service of process in garnishment does not defeat or take away that right, although the right is not asserted and the bookkeeping act of set-off not performed until after service of garnishment process. . . . . Id.* at 447. [Emphasis added.] *See also*, Marrison v.

Hogue, 57 Ohio L.Abs. 571, 95 N.E.2d 15 (Munic.Ct.1950).

Thus, it is implied that before "the service of garnishment process" a bank's right of set-off may be "asserted and the bookkeeping act of set off . . . performed." As seen, *Bank of Marysville*, in upholding the bank's right of set-off, pointed out that the bank had credited "Schlegel's note with the amount due on his deposit account" and "had applied the whole amount due him in payment of the paper, before the presentation of the check." This court has determined that the bank's crediting of the note was performed by bookkeeping entries.

*Goldstein v. Jefferson Title & Trust Co.*, 95 Pa.Super. 167 (1928) is an action of trespass by a depositor against a bank to recover damages alleged to have resulted from the refusal of the defendant bank to pay a check issued by depositor. The bank defended on the ground that on the day payment was refused, and prior to the refusal, plaintiff's credit was reduced by the amount of his note, which matured the same day, leaving his balance insufficient to pay the check. Later in the day depositor made a deposit which increased his balance before the close of business to a sum exceeding the sum of the total of the dishonored check and the note. In upholding the judgment entered below in favor of defendant bank, the Superior (Appellate) Court stated:

> It is an exercise of the right of set-off or application of payment, which does not require previous notice and, of course, may be exercised the moment the depositor's debt matures which is at the opening of business. It need not be evidenced by book entry; in this case the refusal to pay the check for the reason given, is sufficient evidence of intention. *Id.* 95 Pa.Super. at 170.

Although stating that neither "previous notice" nor bookkeeping entry is required to "exercise . . . the right of set-off or application of payment," it

is noteworthy that the court did require "sufficient evidence of intention."

In Aarons v. Public Service Bldg. & Loan Assn. (Integrity Trust Co., garnishee), 318 Pa. 113, 178 A. 141 (1935), the garnishee bank held the $25,000 demand note of defendant Public Service on which $11,000 was owing. On the same date defendant Public Service had a checking account in the garnishee bank with a credit of $4,966.55. The opinion notes:

> The net result was that the bank was not indebted to defendant. Such cross-demands extinguish each other by operation of the defalcation statute. (citations). *Id.* 178 A. at 141.

Bearing upon a bank's exercise of the right of set-off the *Aarons* opinion states:

> The bank was not required first to make book entries charging one account and crediting the other before asserting its right to priority. Goldstein v. Jefferson Title & Trust Co., 95 Pa.Super. 167. If subsequently challenged, as here, the bank was only required to show that it had a "lawful claim" when the writ was served; unless allowed to show and rest on that, it would be deprived of the benefit of the statute and the plaintiff would get more than the statute granted. *The garnishee is not limited to showing that it once had a claim which, before the writ was served, was collected by a bookkeeping entry. To adopt plaintiff's interpretation would render the "subject" clause nugatory.* [Emphasis added.] *Id.* 178 A. at 142.

*Aarons* thus holds that when the garnishee bank is granted set-off by operation of the Pennsylvania defalcation statute, bookkeeping entries to effect a set-off are not required. Significantly,

however, the italicized language further implies that prior to the service of an attachment writ, in other words in a non-judicial set-off, the bank may collect a claim (i. e., effect a set-off) "by a bookkeeping entry."

In the specific area of non-judicial set-off, and defendant's claimed declaration of set-off of Saturday, June 20 can only be treated as a non-judicial set-off, the cases previously reviewed are as pertinent as any cases that research by court and counsel has unearthed. Yet no Ohio case, and indeed none of the other cases researched, is directly dispositive of defendant's claim. Hence this court must forge a rule of non-judicial set-off that it deems would be the applicable Ohio law. The court turns first to the most pertinent cases, and the points therein that relate to non-judicial set-offs.

*Goldstein, supra* holds there must be "sufficient evidence of intention" to show the bank's exercise of the right of set-off; and that the bank's "refusal to pay the check" is evidence of that intention. *Aarons, supra* and *Crothers, supra* acknowledge that by a "bookkeeping entry" a bank may accomplish a set-off. In *Bank of Marysville, supra* not only did the bank credit the debtor's account in advance of presentment but also dishonored the check.

Each of these cases involves a bank action that expresses the bank's intention to set-off. Though unexpressed, a "refusal to pay the check," "a bookkeeping entry," and a "crediting" of a depositor's loan indebtedness each consummated the expressed intention to set off. Though the facts of these cases are unfortunately sketchy on the point it is nevertheless further implicit that each of these bank actions was evidenced by a bank record.[5]

---

5. Another case in which a bank claimed a non-judicial set-off is United States v. Sterling National Bank & Trust Co. of New York, 494 F.2d 919 (2 Cir. 1974). Following the placing of an Internal Revenue lien on a taxpayer's bank account the bank refused to honor the lien because of its claimed right to set off the taxpayer's bank account against a matured loan indebtedness. Supporting the proposition that some bank action is required to effect a set-off the Court stated "Until the bank acted to restrict his right to draw on the funds, Smith was entitled to write checks up to the full amount in the account." *Id.* at 922.

■ The court concludes and it is determined that the elements necessary to effect a non-judicial set-off are: (1) Intention to effect a set-off, (2) consummation of the intention to set-off, and (3) evidence of the consummated set-off in bank records.

## C.

The events of Saturday, June 20, as reconstructed in the deposition testimony of Fangboner, Jones, and Gundic, indicate that in a telephone call at 5:10 p. m. Fangboner informed Jones "we are going to set-off immediately," and "to make the set-off effective as of now." As Jones's testimony shows he called Gundic and informed him

that Mr. Fangboner had set-off the Penn Central deposit against the loan balance, and told him we should put through entries evidencing that set-off just as quickly as possible.

Mr. Gundic indicates that it would be impossible to put through entries at that time . . . but that entries would be put through Monday, June 22 showing that the set-off had in fact been effected on Saturday afternoon, June 20.

Based on these telephone calls defendant argues that Fangboner's declaration and direction of an immediate set-off "itself was a sufficient expression of intent to constitute an assertion of the statutory right of set-off." [6] Adding Jones' transmittal of Fangboner's declaration to Gundic, defendant argues:

The right of set-off was thus asserted and appropriation of the Penn Central account was complete, on Saturday afternoon, June 20, 1970.

Tested by the formulated rule Fangboner's oral declaration of set-off satisfies element one by "expressing an intention to effect a set off." Element two requires "consummation of the intention to set off." It is manifest that an oral declaration of set off although expressing an intention to set off, may not also serve as consummation of the set off. Defendant argues that by virtue of the telephone calls exchanged between Fangboner, Jones, and Gundic

the right of set-off was thus asserted, and appropriation of the Penn Central account was complete, on Saturday afternoon, June 20, 1970.

Suppose Fangboner had made a second call to Jones at 5:20 p. m. in which he rescinded his declaration of set-off. Surely it is not supportable that at 5:10 p. m. the appropriation of the Penn Central account was complete but at 5:20 p. m. the appropriation was vacated and the account returned to Penn Central.

A bank's right to set-off a depositor's account against matured indebtedness is rooted in the law and its right to effect a non-judicial set-off is fully protected by the formulated rule. But to allow the right of non-judicial set-off to be exercised by an oral declaration of set-off without requiring the safeguards of elements two and three of the formulated rule would lead to wrong results. There would be endless disputes as to whether or not a set-off was really effected, if one or more bank officials by oral declarations had the power to turn set-offs on and off like a faucet. Moreover, the right to effect set-offs by oral declarations would give a bank an unfair advantage over its depositors. Proof of an oral declaration of set-off purportedly made by a bank official would depend solely on the bank official's credibility. Without bank records available to verify the set-off a depositor would really have no way to disprove the claimed set-off.

■ Element three requires "evidence of the consummated set-off in bank records." Bank entries evidencing the set-off, as will be seen, were not made on Saturday or Sunday, but were made on Monday, June 22. These entries, although initially incorrect, would have satisfied elements two and three but for Judge Kraft's intervening injunction against offsets issued on Sun-

6. Ohio law authorizes banks to transact any business on any legal holiday and to transact

business "outside of regular banking hours on any day." Ohio Rev.Code §§ 5.30, 5.40.

day, June 21. Thus, the bank's entries in the Penn Central account made after June 21 were rendered ineffective by Judge Kraft's injunction. Accordingly, it is concluded and determined that Fangboner's oral declaration of set-off made at 5:10 p. m. on Saturday, June 20, in a telephone call to Jones and transmitted by Jones to Gundic, does not constitute a valid and effective set-off of the Penn Central account.[7]

## IV.

### A.

Events of June 12, 15, and 16 permit an examination of the bank's action on those days in dealing with set-off of the Penn Central account.

Jones received his directions from Fangboner to be "the control point" in NCB's contacts with Penn Central on June 8. Pursuant to this authority at 3:00 p. m. on Friday, June 12, Jones sent the following set-off memorandum to Gundic, labeled "Set-off Against Account No. 203–877–4 of Penn Central Transportation Company:"

> Please set off immediately the entire balance in the above account, but not to exceed $3,000,000 plus accrued interest, for application upon and credit to the $3,000,000 loan made to the customer on April 28, 1970, under a Letter Agreement dated March 3, 1970, said loan being carried in the Collateral Loan Department. The Legal Department will take the necessary steps to notify the customer that such action has been taken and, therefore, such notice should not be given by your department.

This memorandum discloses an intention to effect set-off of the Penn Central account, and it represents a bank record of that intention. Despite its "set-off" label, the memorandum did not consummate the intention to set off. It directed Gundic to set off the account balance and in substance to consummate the set-off by book entries. Jones's intention to use book entries to consummate the set-off is made irrefutable by a second memorandum that he sent to Gundic at 4:45 p. m. on the same day. It advised Gundic that the 3:00 p. m. set-off is "rescinded and invalidated immediately." It directed that

> any entries made on our books charging the captioned account to the extent of the present balance should be immediately reversed.

On June 15 at 8:25 a. m., Jones sent to Gundic a set-off memorandum identical to the 3:00 p. m. memorandum of June 12. At 4:45 p. m. on June 15, Jones sent a set-off recision memorandum identical to that of June 12. It contained the same direction to Gundic to immediately reverse "any entries made on your books charging the captioned account to the extent of the present balance."

In the four memoranda of June 12 and June 15, Jones made it clear that book entries were essential to consummate the set-off of the Penn Central account. The transactions of June 12 and June 15 thus demonstrate that Jones and Gundic did not treat Jones's set-off memoranda of June 12 and June 15 as sufficient to consummate a set-off of the Penn Central account in the absence of follow-up book entries. Actually, no book entries were made on June 12 or June 15 to debit the Penn Central checking account and to credit the loan account. Moreover, the legal department did not notify Penn Central of a set-off on June 12 or June 15 although Jones had informed Gundic that "The Legal Department will take the necessary steps to notify the customer." In the absence of book entries evidencing the set-off or

---

7. Counsel for NCB argued that the bank could not make proper bookkeeping entries evidencing the set-off on Saturday, since the bank's bookkeeping procedure was computerized and not operational on weekends. Since the bank, by statute, is permitted to perform banking operations outside normal banking hours the bank may not use the time of effecting a set-off as justification for not complying with the formulated rule of nonjudicial set-off.

legal department notification of the set-off, the second element of a non-judicial set-off is missing on June 12 and June 15, since the bank records did not consummate a set-off.

On June 15, Jones circulated another memorandum to seven persons in six different departments in addition to Gundic and his department, indicating that no withdrawals from the Penn Central account were to be honored without prior clearance from either Jones or W. J. Papenbrock of the legal department. Fangboner did not consider this latter document a set-off, but viewed it as a "red flag" to advise various bank personnel to "keep their hands off" the Penn Central business. Though the set-off was allegedly in effect, these "red flags" indicated withdrawals could occur with prior clearance by Jones or Papenbrock and with no indication that recision of the alleged set-off would first be required. These red-flag memoranda are further proof that Jones' set-off memorandum of June 15 to Gundic, like his set-off memorandum of June 12, represented only a written direction to Gundic to consummate a set-off. Each was a bank record that expressed an intention to set off but neither set-off memorandum, standing alone, consummated the intention to set off.[8]

When asked to give the reason for NCB's procedure of setting off in the morning and subsequently rescinding late in the day, Jones answered

A We didn't want the Penn Central to—we didn't want this to happen, the set-off to appear on the Penn Central statement.

Q Can you explain that to me?

A Surely. When we put an entry through in the early morning setting off, this is a completely effective set-off. And then when we reverse it before the end of the business day, the statement of a customer will show that its balance at the end of business was just exactly what it is at that time.

And when we reverse the entry, then it shows that in effect there had been no set-off during the day.

Q Why did you not want to show it, if you had in fact done it?

A Because of the fact that we wanted to keep the good will of the railroad, and because of the "public relations" aspect not only with the railroad but with the various other parties involved in the over-all Penn Central "mess."

It has been seen that the checking account statement of Penn Central does not include any debiting entries on either June 12 or June 15 that reflect the set-off that Jones directed Gundic to make. However, this testimony of Jones remains as an admission that it is the *entry* that makes the set-off "completely effective," and therefore that his two memoranda to Gundic directing the set-off did not consummate the set-off.

On June 16 at 8:25 a. m., Jones sent to Gundic a set-off memorandum identical in content to those dispatched on June 12 and June 15. Once more the memorandum instructed Gundic to set off the entire balance in Penn Central's deposit account for application to the payment of the $3,000,000. However, on June 16 the set-off was evidenced on an NCB loan ledger card. Also prepared was a form entitled "Advice of Checking Account Debit," addressed to Penn Central Transportation Co. and stamped by a loan teller June 16, 1970, with no hour indicated. It included a checking account debit showing the "amount of charge," $927,333.30 and described the bank's action as "Reduction in principal

---

8. The need for bank records to document the consummation of a set-off is exemplified by the court's inability to determine from this record, assuming set-offs were consummated on June 12 and June 15, whether NCB adjusted the interest due NCB from Penn Central to reflect the reduction in the loan obligation. The inference, however, which this court draws is that in the absence of bookkeeping entries reflecting a set-off there would be no basis upon which an interest adjustment would have been made, and that one was not made.

—loan disbursed 4–28–70 in the amount of $3,000,000." A further entry, entitled "Customer's Advice of Loan Payment," addressed to Penn Central, indicates the amount of payment $927,333.-30. Presumably this advice was mailed. Additionally, at 3:05 p. m., Jones telegraphed B. F. Hinkle, Assistant Treasurer of Penn Central Transportation Co., in these words:

> This will acknowledge receipt of your letter of June 12 to our John Hildt. Regret to advise all funds in Penn Central Transportation Company Account #203–877–4 were set off at 8:30 a. m. this date for application upon its outstanding indebtedness to our bank in principal amount of three million dollars ($3,000,000) incurred pursuant to letter agreement dated March 3, 1970. Check in amount of $635,000 mentioned in your June 12 letter and all other withdrawals against said account hereafter presented cannot be honored.

As earlier discussed, Fangboner directed recision of this set-off on June 17 at the request of an officer of First National City Bank. However, the recision does not diminish the evidentiary impact of the bank's actions on June 16, 1970.

Unlike June 12 and June 15, on June 16 bookkeeping entries evidencing the set-off were made. The bank's actions on June 12, 15, and 16 lead the court to conclude that Jones's memoranda of set-off to Gundic consummated a set-off only when it was coupled with follow-up bookkeeping entries in NCB's Penn Central accounts. Therefore, if Jones's set-off memoranda, standing alone, did not consummate a set-off, likewise, as previously held, Fangboner's oral declaration of set-off, relayed in Jones's telephone call to Gundic on Saturday, June 20 at 5:15 p. m., did not consummate a set-off.

In his telegram, Jones advised Penn Central that "all funds . . . were Since Jones is reporting the set-off as a set-off at 8:30 a. m. this date [6/16]." fait accompli, obviously he is not relying on the telegram as a necessary step in consummating the set-off. Thus, the June 16 set-off memorandum and the follow-up book entries, without the telegram, satisfied the three requisite elements for a non-judicial set-off, as previously formulated. It is also true that the telegram satisfies these elements. Simultaneously it informed Penn Central that the bank had an intention to set off its account; that the bank had executed that intention, thus consummating the set-off; and the telegram provides a bank record of the set-off.

 Plaintiffs contend that the March 3, 1970 Letter Agreement in fact required notice by NCB to Penn Central to effect a set-off. The letter agreement contains this provision:

> All such borrowings shall be repaid by us upon your demand (but not later than one year from the date of the first borrowing hereunder), but they may, at our election in any instance, be repaid at any time prior to demand upon our instructions to you by letter or telephone confirmed by a letter mailed the same day and signed by the authorized signators described above. Repayment, whether upon your demand or prior thereto, shall be effected by debiting our account with you, and followed on the same day by written advice of such debit to us.

Plaintiffs argue that the agreement contemplates that NCB could secure repayment of the loan at least in part by a non-judicial set-off against Penn Central's deposit account and that the foregoing provision of the agreement therefore requires set-off to be accomplished "by debiting our account with you, and followed on the same day by *written* advice of such debit to us." NCB urges the agreement did not cover set-off since the bank would not modify a right as significant as set-off without referring to it specifically. Although it can be argued that "repayment" may be accomplished by means of set-off, the right of set-off is so well established in banking law and is such an important protection

for a bank in the conduct of its business that it will not be presumed that the bank intended that the agreement's notice provisions covering repayment should apply to the right of set-off. In the absence of an explicit reference to set-off it is determined that the agreement does not cover the matter of set-off.

### B.

■ Returning to the events that occurred after the oral declaration of set-off, it is undisputed that the first bank actions were those of Jones on Monday morning, June 22. At 7:55 a. m. he sent a memorandum to Gundic entitled "Set-Off Against Account . . . Penn Central . . .," bearing a title the same as the memoranda of June 12, 15, and 16, previously discussed. Unlike those memoranda which directed Gundic to set off the account, this memorandum is wholly retrospective. It begins:

> This will confirm that, pursuant to the instructions received by me from Mr. John S. Fangboner, Chairman of the Board and Chief Executive Officer of this Bank, at 5:10 p. m., Saturday, June 20, 1970, which instructions I relayed to you at approximately 5:15 p. m. on such date, The National City Bank of Cleveland as of 5:10 p. m. on June 20, 1970, set off the entire balance in the above account, . . ..

This memorandum bolsters the testimony of Fangboner, Jones, and Gundic concerning the June 20 declaration of set-off. But, however interpreted, the memorandum, not prepared until Monday morning, June 22, cannot in any event retroactively validate the declaration to set off on June 20 and thereby antedate and supersede the intervening injunction against offsets issued by Judge Kraft on Sunday, June 21, 1970.

Later in the morning of June 22, Jones sent Gundic a second memorandum that stated:

> Confirming the instructions given to your department this morning, in the event that the set-off mentioned in my memo to you this date at 7:55 a. m. is ineffective for any reason as of 5:10 p. m. Saturday, June 20, 1970, said set-off is effective as of this morning at 8:30 a. m.

Asked what he was attempting to accomplish by this memorandum he answered, "I think it was nothing more than a lawyer's normal concern of hedging everything he does." Further uncertainty is reflected by Jones's memorandum sent at 8:15 a. m. on June 22 to heads of seven bank departments. It advised them "no withdrawal . . . is to be honored on [Penn Central's account and another account] until prior clearance is obtained from either the writer or, in his absence, Mr. W. J. Papenbrock;" and that *"any* inquiry with respect to the balance in the accounts . . . should be referred immediately to the writer or to Mr. Papenbrock." If the set-off was in effect no clearance to withdraw funds could be given until the set-off had been rescinded.

According to the typed notes of a secretary in the legal department, bearing her written entry of 10:00 a. m., June 22, Penn Central's main office checking account showed a balance of $927,333.30. Therefore it was after 10:00 a. m. that the bank began to make bookkeeping entries reflecting the set-off on June 22. The final entries were not completed until the end of the week. Numerous corrections in the bookkeeping entries explain the time consumed.

Several examples are illustrative. A Penn Central check in the amount of $22,666.70 was received by the bank and deposited sometime after 3:00 p. m., increasing the total checking account balance to $950,000. The original entry slips indicated a single set-off of $950,000 dated June 22, and therefore could not have been made before 3:00 p. m. Later in the week the single set-off was altered to provide for one set-off amounting to $927,333.30 and a second one for $22,666.70. This second amount was subsequently determined by the Reorganization Court to be improperly set off.

The original loan ledger card recorded the set-off on June 22, and was later changed to reflect a June 20 date. The notice of loan payment form and the ledger credit form were both dated June 22 but stated "as of 6 20 70" in the "source of funds" block on the form. Further, the office copy of the NCB Form Tel 5, which reflects the charge against the Penn Central account, and the Checking Account Debit form are dated June 20, and are apparently hand stamped June 20 by Loan Teller 212. It is undisputed that these activities did not occur on June 20.

All checking account debit slips and loan account credit slips that were prepared to effect the set-offs and that bear the date of June 20, were actually posted on or after June 22. The checking account debit slips were sent to NCB's data control department and were recorded in NCB's data control system and the loan credit slips were machine posted to Penn Central's loan ledger card.

All the bookkeeping entries to effect the set-off were made on or after June 22, and the predating of these entries to read as of June 20 cannot consummate the $927,000 set-off as of June 20. With Judge Kraft's order intervening on Sunday, June 21, NCB's entries of June 22 and thereafter, though predated June 20, could not retroactively validate Fangoner's set-off declaration of June 20. Circumvention of Judge Kraft's order would otherwise result.

At 3:02 p. m. on Monday, June 22, Jones telegraphed Penn Central advising in part that "all funds in Penn Central . . . account . . . were set-off at 5:10 p. m. June 20, 1970 . . . ." Like the entries of June 22 and thereafter that stated the set-off occurred June 20, this telegram sought on June 22 to confirm Fangboner's declaration of 5:10 p. m. June 20. As previously determined, this effort to retroactively confirm the oral declaration cannot succeed.

## V.

On the foregoing grounds and for the reasons previously stated it is concluded and determined that defendant NCB has failed by a preponderance of the evidence to sustain its defense of set-off. Fangboner's oral declaration of set-off on June 20 did not consummate a set-off of the Penn Central account tested by the rule and its requisite three elements deemed applicable to non-judicial set-offs.

Furthermore, considering the business relationship between the parties and the bank's actions relating to set-off of the Penn Central account, both before and after June 20, it is concluded and determined that defendant's own conduct indicated that an oral declaration of set-off is not a valid set-off without bank records evidencing the intention to effect a set-off and consummation of that intention. It is concluded and determined that NCB did not consummate a set-off until after Penn Central had filed its petition for reorganization. Therefore, NCB's set-off of the Penn Central checking account was subject to the Reorganization Court's injunction against offsets and was improper.

National City Bank is ordered to rescind the set-off it effected after the filing of the petition for reorganization, and credit to Penn Central's account in the amount of $927,333.30. National City Bank is further ordered to credit to Penn Central's account interest at the rate of 6% per annum from June 21, 1970, and to honor any requests for withdrawal upon the Penn Central account by the Penn Central trustees.

Plaintiff's request for punitive damages and reasonable attorney's fees are denied. All interim orders and rulings made by the court during the pendency of this litigation are hereby affirmed.

It is so ordered.